## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| SITEPRO, INC., <br><br> Plaintiff, <br><br> v. <br><br> PLOW TECHNOLOGIES LLC, PLOW TECHNOLOGIES TEXAS LLC, PAKENERGY, LLC, PAKENERGY CONSULTANTS, LLC, PAKENERGY HOLDINGS, LLC, PAKENERGY INTERMEDIATE, LLC, PAKENERGY LAND, LLC, AND PAKSCADA, LLC <br> Defendants. | **C.A. No. 3:25-cv-1446** <br><br> **JURY TRIAL DEMANDED** |

### PLAINTIFF'S ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff SitePro, Inc. ("SitePro") files this Original Complaint for patent infringement against Defendants Plow Technologies LLC, Plow Technologies Texas LLC (collectively, "Plow"), PakEnergy, LLC, PakEnergy Consultants, LLC, PakEnergy Holdings, LLC, PakEnergy Intermediate, LLC, PakEnergy Land, LLC (collectively, "PakEnergy"), and PakScada, LLC ("PakScada") (collectively, "Defendants") respectfully alleging as follows:

### THE PARTIES

1.      Plaintiff SitePro, Inc. is a Delaware corporation having its principal place of business at 9502 US-87, Lubbock, TX 79423.  SitePro has an additional place of business located at 1523 E. Sonterra Blvd., San Antonio, TX 78258.

2.      Defendant Plow Technologies LLC ("Plow OK") is a is an Oklahoma limited liability corporation, with a principal place of business located at 8925 NW 10th St., Oklahoma City, Oklahoma 73127.  Plow Technologies LLC may be served through its registered agent, Scott Murphy, at 1000 Preston Park, Yukon, Oklahoma 73099.

3.      Defendant Plow Technologies Texas LLC ("Plow TX") is a Texas corporation, with a principal place of business located at P.O. Box 851012, Yukon, Oklahoma 73085-1012. Plow Technologies Texas LLC also maintains a regular and established place of business at 6413 N State Hwy 349, Suite H, Midland, Texas 79705, which defendants acknowledge was a warehouse for parts operated by Plow Technologies Texas LLC during the damages period in this Case. Plow Technologies Texas LLC also rented a house at 8807 Pica Ct., Odessa, TX 79765 as a temporary living quarter for field services employees. Plow Technologies Texas LLC may be served through its registered agent, Will Taylor, at 6413 N State Hwy 349, Suite H, Midland, Texas 79705.

4.      Defendant PakEnergy, LLC is a Delaware corporation, with a principal place of business located at 500 Chestnut St., Suite 500, Abilene, Texas 79602. PakEnergy, LLC may be served through its registered agent, The Corporation Trust Company, at Corporation Trust Center, 1209 Orange St., Wilmington, Delaware 19801.

5.      Defendant PakEnergy Consultants LLC is a Delaware corporation, with a principal place of business located at 500 Chestnut St., Suite 500, Abilene, Texas 79602. PakEnergy Consultants, LLC may be served through its registered agent, The Corporation Trust Company, at Corporation Trust Center, 1209 Orange St., Wilmington, Delaware 19801.

6.      Defendant PakEnergy Holdings LLC is a Delaware corporation, with a principal place of business located at 500 Chestnut St., Suite 500, Abilene, Texas 79602. PakEnergy Holdings, LLC may be served through its registered agent, The Corporation Trust Company, at Corporation Trust Center, 1209 Orange St., Wilmington, Delaware 19801.

7.      Defendant PakEnergy Intermediate LLC is a Delaware corporation and has a principal place of business located at 500 Chestnut St., Suite 500, Abilene, Texas 79602.

PakEnergy Intermediate, LLC may be served through its registered agent, The Corporation Trust Company, at Corporation Trust Center, 1209 Orange St., Wilmington, Delaware 19801.

8.    Defendant PakEnergy Land LLC is a Delaware corporation, with a principal place of business located at 500 Chestnut St., Suite 500, Abilene, Texas 79602.  PakEnergy Land, LLC may be served through its registered agent, The Corporation Trust Company, at Corporation Trust Center, 1209 Orange St., Wilmington, Delaware 19801.

9.    Defendant PakScada, LLC is a Delaware corporation, with a principal place of business located at 500 Chestnut St., Suite 500, Abilene, Texas 79602.  PakScada, LLC may be served through its registered agent, C T Corporation System, at 1999 Bryan Street Suite 900, Dallas, Texas 75201.

10.    A substantial part of the events giving rise to SitePro's causes of action as alleged herein occurred in the Northern District of Texas and have a direct effect on SitePro in the Northern District of Texas.  SitePro identified the involved entities to the best of its ability; however, there are multiple relevant entities registered in Texas, Delaware, and Oklahoma, and the corporate structure is difficult to discern.

## JURISDICTION AND VENUE

11.    By making the following allegations, SitePro not only alleges that the Court may exercise jurisdiction over this dispute and that venue is proper in this District—the following allegations also constitute theories of liability for patent infringement against Defendants.

12.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, including 35 U.S.C. § 271.

13.    As discussed in greater detail below, Defendants have committed acts of patent infringement and/or has induced and/or contributed to acts of patent infringement by others in this

judicial district, the State of Texas, and elsewhere in the United States, and continue to do so willfully and without authorization by making, using offering for sale, selling, or importing various products or services that infringe SitePro's Asserted Patent (defined below).

14.    This Court has personal jurisdiction over Defendants because Defendants have minimum contacts within the State of Texas; Defendants have purposefully availed themselves of the privileges of conducting business in the State of Texas; Defendants regularly conduct business within the State of Texas; and SitePro's causes of action arise directly from Defendants' business contacts and other activities in the State of Texas, including by virtue of Defendants' infringement in the State of Texas. Indeed, Defendants have advertised, promoted, offered for sale, sold and/or distributed and continue to advertise, promote, offer for sale, sell, and/or distribute infringing products to customers and potential customers in this judicial district. SitePro, its customers, and its potential customers reside in the State of Texas, including in this judicial district and therefore Defendants' acts giving rise to this lawsuit and the harm SitePro has suffered have both occurred in this judicial district.

15.    Venue is appropriate in this judicial district under 28 U.S.C. § 1400(b) because Defendants have committed acts of infringement in and/or have induced and/or contributed to acts of infringement by others in this District, and maintain regular and established places of business in, this District as set forth above, including at least at PakEnergy and PakScada's Abilene office at 500 Chestnut St., Suite 500, Abilene, Texas 79602.

16.    In addition, or in the alternative, venue is appropriate in this judicial district under 28 U.S.C. § 1400(b) because PakEnergy operates as an agent of Plow such that PakEnergy's making, use, sale, and offering for sale of the Accused System in this District is attributable to Plow. On information and belief, Plow directs and/or controls PakEnergy to infringe the Asserted

Patents by, *inter alia*, performing one or more steps of SitePro's patented claims, including, but not limited to, "receiving, with a first computing system, via a network interface, a plurality of commands encoded in a first protocol to control a plurality of commands encoded in a first protocol to control a plurality of different fluid-handling devices at a fluid-handling site, different commands among the plurality of commands being directed to different fluid handling devices among the plurality of fluid-handling devices . . . ." *See* '184 Patent, at Claim 1.  Through acts taken as part of this agency relationship, Defendants are liable for infringement of SitePro's Asserted Patents.

17.    In addition, or in the alternative, venue is appropriate in this judicial district under 28 U.S.C. § 1400(b) because PakScada operates as an agent of Plow and PakEnergy such that PakScada's making, use, sale, and offering for sale of the Accused System in this District is attributable to Plow and PakEnergy.   On information and belief, PakScada directs Plow, through PakEnergy, to infringe the Asserted Patents by, *inter alia*, performing one or more steps of SitePro's patented claims, including, but not limited to, "receiving, with a first computing system, via a network interface, a plurality of commands encoded in a first protocol to control a plurality of commands encoded in a first protocol to control a plurality of different fluid-handling devices at a fluid-handling site, different commands among the plurality of commands being directed to different fluid handling devices among the plurality of fluid-handling devices . . . ." *See* '184 Patent, at Claim 1.  Through acts taken as part of this agency relationship, Defendants are liable for infringement of SitePro's Asserted Patents.

18.    In addition, or in the alternative, venue is appropriate in this judicial district under 28 U.S.C. § 1400(b) because, upon information and belief, PakScada operates as an alter ego of Plow and PakEnergy such that PakScada's making, use, sale, and offering for sale of the Accused

System is attributable to Plow and PakEnergy.  PakEnergy LLC, PakEnergy Consultants LLC, and PakEnergy Holdings LLC are under common ownership, while PakEnergy Land LLC is owned by PakEnergy Holdings LLC and Plow and PakScada are wholly owned by PakEnergy LLC. PakEnergy Holdings LLC operates as a mere shell company for its respective subsidiaries.  On information and belief, PakEnergy Intermediate is a parent, child, or sister corporation to each of these entities, based on its name and shared registered agent with the other PakEnergy entities.  As such, Defendants' corporate structure justifies piercing the corporate veil because, *inter alia*, (1) parent and subsidiary Defendants have common stock ownership; (2) parent and subsidiary Defendants share common directors or officers, including Scott Murphy, who is Managing Member of Plow TX and Plow OK and Vice President of Product of PakScada, and Melissa Pursley, who is CFO of each of the named Pak defendants; (3) parent and subsidiary Defendants have common business departments; (4) parent and subsidiary Defendants file consolidated financial statements; (5) parent Defendants finance the subsidiary Defendants; (6) parent Defendants caused the incorporation of the subsidiary Defendants; (7) the subsidiary Defendants operate with grossly inadequate capital; (8) the parent Defendant pays salaries and other expenses of subsidiary Defendants; (9) the subsidiary Defendants receive no business except that given by the parent Defendants; (10) the parent Defendants uses the subsidiary Defendants' property as their own; (11) the daily operations of the Defendants are not kept separate; and (12) the subsidiary Defendants do not observe corporate formalities.  Plow and PakEnergy are therefore liable for infringement at least through the actions of PakScada, the alter-ego of Plow and PakEnergy.

19.    In addition, upon information and belief, venue is proper in this district because PakScada, pursuant to an Asset Purchase Agreement executed between PakScada and Plow Technologies, LLC, PakScada acquired all assets from Plow regarding the OnPing system ("the

Accused System"). Moreover, upon information and belief, PakScada and Plow irrevocably submitted to the exclusive jurisdiction of the federal courts of the United States of America located in Dallas County, Texas, for any proceeding or dispute arising out of or relating to said Asset Purchase Agreement. PakScada and Plow Technologies, LLC's section of venue and jurisdiction in the federal courts in Dallas County confirm that this jurisdiction and venue are preferred and convenient for PakScada and Plow Technologies, LLC . Further, Claims in this case relate to the Asset Purchase Agreement because, upon information and belief, PakScada acquired assets and liabilities from Plow regarding the Accused System through execution of the Asset Purchase Agreement.

## BACKGROUND

20. For more than a decade, SitePro has been at the forefront of data analytics, monitoring, and control of fluids in the energy (saltwater disposal ("SWD") and Oil & Gas), municipal, and agriculture industries. SitePro initially sought to enable the digital oil field. From there, it evolved its technology for use in the municipal and agriculture industries. SitePro focuses on developing market-leading software and hardware products that deliver easy-to-use, scalable fluid analytics, monitoring, and control. SitePro has developed and continues to develop state-of-the-art, award-winning software products, hardware, and equipment. SitePro combines an integrated, best-in-class cloud-based software as a service (SaaS) and mobile application. Both SitePro's software and hardware products and cloud services are vital to SitePro and its customers' businesses.

21. SitePro began as AmpliSine Labs, LLC, which was founded in November 2009. The company was founded to focus on reimagining control and management systems in the underserved SWD market, which in 2011 was a process-intensive business with limited viable software options outside of expensive traditional supervisory control and data acquisition

("SCADA") systems. AmpliSine Labs changed its name to SitePro, LLC (Texas entity) in July 2018 and then ultimately to SitePro, Inc. effective January 1, 2019.

22.    In the early days of the company, SitePro had initially explored using existing SCADA systems but quickly determined that the then state-of-the-art SCADA systems could not adequately serve the SWD industry or address the significant problems facing their potential SWD customers. SitePro's early executive team, Aaron Phillips and David Bateman, identified a need to develop their own proprietary system from scratch.

23.    Traditional oil field control systems typically had an automation system installed onsite to control the equipment on that site, including pumps, valves, actuators, etc., while also gathering data from sensors within the system or input from individuals at the site. A separate system would allow for access to that data from a web-based platform.

24.    SitePro's system was (and is) unique and went well beyond these traditional systems in developing proprietary technology that combined the onsite automation system with the web-based control platform in one application. SitePro became the missing link in oilfield digital fluid logistics. For example, SitePro's proprietary system features a "no-code" configuration module, advanced ticketing capabilities, and real-time integrated mapping and visualization never previously offered or envisioned by traditional SCADA systems. SitePro later departed from the physical server setup used by traditional systems at the time, and instead built its new platform on Microsoft's Azure cloud.



SitePro's proprietary system monitors tank levels, volumes, pressures, flow rates, and many other data points in real-time. It allows organizations to control pumps and valves right from a smartphone or a computer. SitePro's system is robust and comprehensive, covering real-time data analytics, truck ticketing transactions, and remote management of multiple sites (like an SWD facility) remotely from an office in a large city. SitePro's system also offered scalability well-beyond traditional SCADA systems by pre-programing and creating new parameters for certain nodes and equipment commonly found in a SWD system so that customers (regardless of technical aptitude/familiarity) could quickly and safely add, remove, edit, and control equipment, such as actuators, pumps, valves, and sensors. SitePro additionally developed a mobile application so that its customers could access data, collect data, and control equipment from their mobile devices. In fact, SitePro's proprietary system enabled a sensor reading to be delivered to a user's browser or mobile application less than one second after it was taken in the field.

25.      SitePro has been awarded multiple United States patents for its inventions in many technical areas including edge computing, protocol translation (e.g., in which a remote server speaks a single universal language to monitor and control systems in the field, and local "site master controllers" translate those commands in the universal language to device-specific

protocols, like Modbus, USB, etc.), and multi-tenant SaaS systems for monitoring and controlling fluid-handling equipment.

26.     SitePro owns the entire right, title, and interest in and to U.S. Patent No. 12,321,184 (the "'184 Patent" or the "Asserted Patent"), including the right to seek damages for past and ongoing infringement.  SitePro also owns many other patents and patent applications that are not asserted in this case at this time.

27.     The '184 Patent issued on June 3, 2025.  A true and correct copy of this patent is attached hereto as Exhibit 1.

28.     The named inventor of the '184 Patent is Aaron Phillips.  The title of the '184 Patent is "Remote control of fluid-handling devices."

29.     Aaron Phillips invented and had a complete conception of the subject matter covered by the '184 Patent at least as early as January 2012.  The date of invention for the '184 Patent is supported by significant evidence (e.g., original inventor notes; early versions of code; customer invoices).

30.     SitePro has complied with the marking requirements of 35 U.S.C. § 287 at least because its patents are displayed publicly on SitePro's website—https://www.sitepro.com/legal/patent-information—as well as SitePro's customer login portal—https://auth.sitepro.com/Account/Login.

31.     On Plow's website, Plow advertises itself as "a leader in oil and gas production well site automation with over a decade in the oil field."  *See* https://www.plowtech.net/.  Plow indicates that it engages across a range of industries, including the following listed on the home page of its website: (1) Upstream Oil & Gas, (2) Midstream Oil & Gas, (3) SWD and Water Transportation,

(4) Renewable Energy, (5) Water and Wastewater, (5) Manufacturing, (6) Food & Beverage, and (7) Facilities Management. *Id.*

32.     Plow's website offers a variety of services, including, but not limited to, "Digital Transformation," "Fluid Transportation System Design," "Product Platforming," "SCADA System Design," "Industrial Network Design," and "Control Systems Design and Build." *Id.* Plow indicates that at least some of these services "are centered around OnPing, Plow Technologies' innovative platform that simplifies the creation and management of automation systems."

33.     In addition, in a press release announcing PakEnergy's acquisition of Plow, it is stated that "Plow Technologies is widely recognized as the creator and provider of OnPing, an innovative cloud SCADA platform for oilfield applications, manufacturing, and more." https://pakenergy.com/blog/pakenergy-acquires-plow-technologies-expanding-suite-of-optimization-solutions.  Upon information and belief, Plow, PakEnergy, and PakScada make, use, sell, and/or offer to sell the OnPing system ("the Accused System").

## I.    SitePro's '184 Patent is Directed to Mediums and Systems for Improving the Remote Control of Fluid-Handling Devices—Not an Abstract Idea

34.     As described below, the claims of the '184 Patent provides several technical solutions to tangible, technical problems experienced by the field of oil and gas monitoring and control at the time of the priority date of the '184 Patent.  Indeed, the '184 Patent describes multiple inventions that provide marked improvements to the prior art's limited practice of remote control of fluid-handling devices.

A.     **Background of the Technical Field of Oil and Gas Monitoring and Control**

35.     Historically, fluid-handling facilities, such as oil wells and salt water disposal facilities, required manual supervision, with facility operators hiring "pumpers" to travel to various production sites, often in remote, isolated areas, to monitor the facilities and production.

36.     At the time of the '184 Patent's priority date, supervisory control and data acquisition ("SCADA") systems provided some remote monitoring of the facilities; however, SCADA's technical capabilities were limited, making its use in remote oil and gas fluid-handling facilities unattractive.

37.     At the time of the '184 Patent's priority date, one significant problem limiting the application of SCADA systems in diffuse, remote locations was their reliance on a reliable network connection.  Such connections were often lacking at remote oil and gas-related fluid-handling facilities due to the lack of reliable wireless infrastructure in rural areas.  A strong network connection was essential to the operation of SCADA systems at the time because any time logic more complex than rudimentary control logic (e.g., timers and ladder logic on programmable logic controllers) was required, it had to be implemented in the SCADA master station.  At the time, SCADA master stations provided a centralized point of control and monitoring by being centrally located (and thus remote from the fluid-handling sites).  As a result, unreliable networks often prevented the use of SCADA for remote control of fluid-handling sites that relied on more complex logic only suitable for execution in the SCADA master station.  This problem is described in the specification of the '184 Patent:

> [M]any of these systems fail when a network connection is lost.  Remote logic controlling such systems generally ceases to exercise control when the remote logic is disconnected in the event of a network failure.  Further, some SCADA systems require the installation of special-purpose software on a computing device in order to exercise control remotely, which tends to deter users from exercising remote control of fluid-handling devices due to the burden of configuring each computer from which remote control is exercised.

'184 Patent at 1:67-2:10.

38.    A second problem faced by existing SCADA systems at the time of the '184 Patent's priority date was that the lack of native interoperability made it difficult to scale such systems.  As noted in the passage quoted above, "some SCADA systems require the installation of special-purpose software on a computing device in order to exercise control remotely."  *Id.* Each time a new device was added in the field, the SCADA master station needed to be taken down to install special-purpose software for that device, potentially halting operations in an entire region just to change a sensor at one well site or install a pump at another, for example.

39.    The need to install special-purpose software in the SCADA master station arises because fluid-handling devices are varied in nature, function, and origin.  Different fluid-handling devices (e.g., pumps, valves, motors, etc.) each "speak" different languages, and thus require translation of commands into each fluid-handling device's own language before they can be understood and executed.  The variety of different languages (or "protocols") necessary to operate a complex facility like a salt-water disposal site poses a problem that becomes even more difficult when manufacturers of fluid-handling devices operate with their preferred choice of protocol, which often differs from other manufacturers' preferred protocol.  When multiple fluid-handling devices from different manufacturers operating under different protocols are implemented together at a facility, the prior art SCADA systems suffered from scaling issues and fragility, as the centralized SCADA master station underwent new software installations any time a new device was installed in the field.

**B.    SitePro's '184 Patent Provides an Inventive Solution to the Problem Faced by SCADA Systems Which Fail During a Network Outage: Pushing Program Logic to the Edge of the Network.**

40.    The '184 Patent improves upon SCADA system technology by addressing the shortcomings of then-existing SCADA networks by providing methods, systems, and processes to

continue operation, control, and monitor fluid-handling facilities without maintaining a stable network connection. The '184 Patent solved this problem by offering a new, inventive element—pushing program logic to the edge of the network of fluid-handling sites and devices. For example, the '184 Patent discloses operations comprising, *inter alia*:

> obtaining, with the first computing system, site data and storing the site data in a report buffer of the first computing system, such that the site data in the report buffer is not lost in the absence of the network connection, the site data including alarms, measurements from sensors, or other data associated with the fluid-handling site or associated with at least some of the plurality of fluid-handling devices; [and]

> sending, with the first computing system, the site data stored in the report buffer to a remote second computing system.

'184 Patent at 17:25-35.

41.    Furthermore, as another example, the '184 Patent discloses:

> The site master-controller **18**, thus, may be operative to receive commands from the site server **36** of the command-center server **14**, translate those commands, identify the appropriate control bus **60** and, if needed, address on the control bus, and implement the command once received, even if network access is lost after the command is issued from the command-center server **14**. Further, the site master-controller **18**, in some embodiments, is operative to retrieve sensor data, alarms, and other site data, and buffer such data in the report buffer **104**, before the data is periodically returned to the command-center server **14**, such that buffered data is not lost if network access ceases intermittently.

'184 Patent at 11:20-31.

42.    As another example, the '184 Patent discloses a system comprising, *inter alia*:

a fluid-handling site;

a plurality of fluid handling devices at the fluid handling site; and

a first computing system communicatively coupled to the plurality of fluid handling devices, the first computing system storing instructions that, when executed by the first computing system, effectuate operations comprising . . .

for at least some of the plurality of commands, determining, with the first computing system, a plurality of different target states of a given one of the fluid-handling devices over time, wherein the first computing system is operative to

maintain control of the fluid handling devices in an absence of an external network connection . . .

obtaining, with the first computing system, site data and storing the site data in a report buffer of the first computing system such that the site data in the report buffer is not lost in the absence of the network connection, the site data including alarms, measurements from sensors, or other data associated with the fluid-handling site or associated with at least some of the plurality of fluid-handling devices;

sending, with the first computing system, the site data stored in the report buffer to a remote command center server . . . .

'184 Patent at 20:54-22:5. *See also, e.g.,* '184 Patent at Fig. 1 and Fig. 3.

43. This provided a tremendous benefit: under this invention, if a fluid-handling site lost connection with the central server of the broader SCADA system, the fluid-handling site could continue to execute relatively complex logic with field devices, record data, and send that data back to the broader SCADA system when the network came back online. This also provided an important efficiency: ensuring the continued remote monitoring of fluid-handling facilities, even in the event of a network outage. Under the inventions claimed by the '184 Patent, the fluid-handling sites can continue to control devices even in the absence of a connection to the broader network, instead of rendering the system inoperable.

**C.    SitePro's '184 Patent Provides Another Inventive Solution to the Problem of Overburdened SCADA Systems that Translate and Issue Commands from a Central Command Server—Performance of Protocol Translation at the Edge of the SCADA Network.**

44. A second, distinct invention offered by the '184 Patent is the ability of the disclosed system to perform protocol translation at the edge of a SCADA network to shield the broader SCADA system from the complexity of managing diverse protocols implemented by sensors and actuators in the field. This provided a significant benefit to then-existing SCADA systems, which had to manage an extremely varied and diverse set of protocol languages—which are often quite different for each type and brand of fluid-handling device (e.g., pumps, motors, valves, etc.)—

from a centralized command-center server.  By implementing systems and methods that use innovative protocol translation at the edge of the network, rather than at the command-center level, the resiliency and scalability of the SCADA system are increased, providing significant efficiency in operation and reducing strain on the network.  Moreover, protocol translation at the edge of a network presents the additional efficiency of allowing computer engineers to draft command prompts in a single language at the command-center server level, rather than having to write commands in the different and varied languages of fluid-handling devices in the field.

45.    To exercise the invention of SitePro's Asserted Patent, the '184 Patent requires the use of unique hardware and software distinguishable from the functions of a typical computer used in the field of oil and gas monitor and control.  For example, the '184 Patent disclose the use of an edge-based "protocol multiplexer," a unique and novel component not present in then-existing SCADA systems.  This component is disclosed, for example, in the'184 Patent which claims a medium storing instructions that, when executed by one or more processors, effectuate operations comprising, *inter alia*:

> translating, with the first computing system, the plurality of commands into translated commands encoded in a plurality of protocols different from the first protocol, at least some of the translated commands being operative to cause a local controller of the given fluid-handling device to the plurality of different target states, and the local controller being responsive to the at least some of the translated commands and feedback from the given first fluid-handling device, the feedback being indicative of whether the given fluid-handling device is in the targeted states among the plurality of different target states.

'184 Patent at 17:12-22.

46.    The specification describes some of the abilities of the protocol multiplexer in the context of protocol translation at the edge of the SCADA network:

> "[W]hen the site management module **70** receives a command via the network interface **68**, or issues its own command (e.g., to poll sensors or alarm logs), the command is conveyed to a protocol multiplexer **72**, which may be operative to determine which control bus **60** and fluid-handling device **38** will receive a

corresponding translated command. For example, the protocol multiplexer **72** may store in memory records for communicating with the fluid-handling devices **38**. Each record may correspond to a[n] individual fluid handling device **38** or an individual actuator or sensor of a fluid-handling device, and each record may include a unique identifier of the corresponding device, actuator, or sensor; a control bus address of the device, actuator, or sensor (for those components on a control bus that is addressable); an identifier of the control bus **62**, **64**, or **66** through which the site master-controller **18** communicates with the device, actuator, or sensor, and an identifier of the protocol through which such communication occurs.

'184 Patent at 9:16-33.

47.     The specification goes on to describe additional, specific structures implemented in the protocol multiplexer, including the specific forms of protocols themselves:

When a command is received at the protocol multiplexer **72**, in some embodiments, the command includes the identifier of the device, actuator, or sensor to which the command is directed, and using this identifier, the protocol multiplexer **72** retrieves the corresponding record from memory to identify the appropriate protocol. In this example, based on the protocol in the record, the protocol multiplexer **72** selects among the command translators **74**, each of which corresponds to a different protocol. For example, the command translator **80** may correspond to a protocol of control bus **66**, Such as the modbus RTU protocol; the command translator **78** may corresponds to a protocol of the control bus **64**, such as a binary or analog voltage or current signal conveyed via a data acquisition board; and the command translator **76** may corresponds to a protocol of the control bus **62**, such as the Ethernet protocol.

'184 Patent at 9:34-49.

48.     Thus, far from using generic or conventional computing components, the '184 Patent requires special-purpose computing devices configured in the manner disclosed to ensure the continued monitor and operation of fluid-handling devices in the absence of a network connection as well as performance of protocol translation at the edge of a network. SitePro's Asserted Patent covers technology that provides specific means for obtaining specific improvements for specific problems in the field of data analytics, monitoring, and control of fluids in the energy, municipal fluid management, and agricultural industries.

## COUNT I

### Infringement of the U.S. Patent Nos. 12,321,184.

49.     SitePro repeats and realleges as if fully set forth herein, the allegations set forth in the foregoing paragraphs of this Complaint.

50.     Defendants directly infringed and continue to directly infringe, under 35 U.S.C. § 271(a), literally and/or under the doctrine of equivalents, at least claims 1-31 of the '184 Patent by manufacturing, using, selling, offering to sell, and/or importing into the United States the Accused System.

51.     In addition, or in the alternative, Defendants are liable for joint enterprise infringement because, *inter alia*, Defendants have (1) an agreement, express or implied, to work together to make, use, sell, or offer for sale the Accused System, (2) a common purpose to infringe the claims of the '184 Patent carried out by various officers and employees that work for an on behalf of Defendants, (3) a community of pecuniary interest in that purpose, *i.e.*, profits from the making, use, and sale of the Accused System which is paid to Defendants from customers or as dividends to PakEnergy and/or FPC-WP Investment, and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control, as evidenced based on shared officers and employees between Defendants, and a common effort to make, use, and sell the Accused System.

52.     Defendants have been and is indirectly infringing the '184 Patent by actively inducing or contributing to the direct infringement by others of the '184 Patent in the United States, the State of Texas, and this District.

53.     Defendants also have been and are now knowingly and intentionally inducing infringement of at least claims 1-31 of the '184 Patent in violation of 35 U.S.C. § 271(b).

Defendants have had knowledge of the '184 Patent and the infringing nature of the Accused System and other similar systems since at least the filing and service of this Complaint.

54.     Defendants specifically intended and were aware that the ordinary and customary use of the Accused System and other similar systems would infringe the '184 Patent.

55.     Defendants further took active steps to encourage end users to use and operate the Accused System and other similar systems, despite knowing of the '184 Patent, in a manner they knew to directly infringe at least claims 1-31 of the '184 Patent.  Further, Defendants provided product manuals and other technical information that cause their subscribers, customers, and other third parties to use and to operate the Accused System and other systems for their ordinary and customary use, such that Defendants' customers and other third parties have directly infringed the '184 Patent, through the normal and customary use of the Accused System and other similar systems.

56.     Defendants also have been and are now in violation of 35 U.S.C. § 271(c) by contributing to infringement of at least claims 1-31 of the '184 Patent, literally and/or under the doctrine of equivalents, by, among other things, selling, offering for sale, and/or importing within this judicial district and elsewhere in the United States, the Accused System and other similar systems with knowledge of the '184 Patent and knowing that the Accused System and other similar systems are especially made or especially adapted for use in the infringement of the '184 Patent, and is not a staple article or commodity of commerce suitable for substantial noninfringing use.

57.     In addition, or in the alternative, Defendants are liable for infringement of the '184 Patent under §§ 271(a), (b), and/or (c) because Plow acts as the agent of PakEnergy and FPC-Investment, and at the direction and control of PakEnergy and FPC-Investment directly infringes, induces infringement, and/or contributes to infringement of at least claims 1-31 of the '184 Patent.

58.     In addition, or in the alternative, Defendants are liable for infringement of the '184 Patent under §§ 271(a), (b), and/or (c) because Energy OnRamp acts as the agent of Plow, PakEnergy, and FPC-Investment, and at the direction and control of Plow, PakEnergy, and FPC-Investment directly infringes, induces infringement, and/or contributes to infringement of at least claims 1-31 of the '184 Patent.

59.     In addition, or in the alternative, Defendants are liable for infringement of the '184 Patent under §§ 271(a), (b), and/or (c) because Plow is the alter-ego of PakEnergy and FPC-Investment, and thus Plow's direct infringement, induced infringement, and/or contribution to infringement of at least claims 1-31 of the '184 Patent is imputed to PakEnergy and FPC-Investment.

60.     Defendants' infringement (both direct and indirect) of the '184 Patent has been, and continues to be, with full knowledge of the '184 Patent, since at least as early as the filing of this lawsuit, or as early as Defendants' employees have accessed the patent information on SitePro's website.

61.     For example, Claim 30 of the '184 Patent recites:

A system, comprising:

a plurality of fluid handling devices; and

a first computing system communicatively coupled to the plurality of fluid handing devices, the first computing system storing instructions that, when executed by the first computing system, effectuate operations comprising:

receiving, with a first computing system, via a network interface, a plurality of commands encoded in a first protocol to control a plurality of different fluid-handling devices at a fluid-handling site, different commands among the plurality of commands being directed to different fluid handling devices among the plurality of fluid-handling devices, wherein:

the plurality of commands are responsive to inputs to a command interface presented on a remote user computing device, and

the plurality of commands are received after determining that a user of the remote user computing device is authorized to issue commands to the first computing system based on a user account that indicates the user is authorized to issue commands to the first computing system, the user account being accessed from a data store;

for at least some of the plurality of commands, determining, with the first computing system, a plurality of different target states of a given one of the fluid-handling devices over time, wherein the first computing system is operative to maintain control of the fluid handling devices in an absence of an external network connection;

translating, with the first computing system, the plurality of commands into translated commands encoded in a plurality of protocols different from the first protocol, at least some of the translated commands being operative to cause a local controller of the given fluid-handling device to the plurality of different target states, and the local controller being responsive to the at least some of the translated commands and feedback from the given fluid-handling device, the feedback being indicative of whether the given fluid-handling device is in targeted states among the plurality of different target states;

sending, with the first computing system, the translated commands to the local controllers;

obtaining, with the first computing system, site data and storing the site data in a report buffer of the first computing system such that the site data in the report buffer is not lost in the absence of the network connection, the site data including alarms, measurements from sensors, or other data associated with the fluid-handling site or associated with at least some of the plurality of fluid-handling devices;

sending, with the first computing system, the site data stored in the report buffer to a remote second computing system.

62.    By way of example, the Accused System meets every element of Claim 30.

63.    To the extent the preamble is found limiting, the Accused System is a system:



https://www.plowtech.net/industries/upstream-oil-and-gas/.

64.     As shown in the example below, the Accused System further comprises a plurality of fluid handling devices: "The OnPing Lumberjack avoids all of this by acting as a micro server on site.  The Lumberjack sits on your site, polling **all field devices** on a local network, archiving, and storing all the results and passing them to our remote servers."



https://onping.net/lumberjack-edge-computer-specifications/ (emphasis added).

65.     As shown in the examples below, the Accused System further comprises a first computing system communicatively coupled to the plurality of fluid-handling devices, the first computing system storing instructions that, when executed by the first computing system, effectuate operations:



# Better Networks with Lumberjack Remote

https://onping.net/?s=better+networks+with+lumberjack.  "OnPing's unique structure of cloud SCADA application and advanced on-site Lumberjack Edge Computers produces industry leading speed with real time polling."  https://onping.net/.  "The OnPing Lumberjack avoids all of this by acting as a micro server on site.  The Lumberjack sits on your site, polling all field devices on a local network, archiving, and storing all the results and passing them to our remote servers."



https://onping.net/lumberjack-edge-computer-specifications/.

# Oil & Gas

OnPing can enable remote management of production sites or entire fields from any device 24 hours a day. Advanced lift applications, HMI, data collection and visualization, alarms and custom reporting, all from one source.

https://onping.net/markets/.

Plow Technologies has rental remote well monitoring skids for operators who want the many benefits of SCADA data and control without the big capital expenditure of permanently installed hardware.

Our SCADA rental skids include a sturdy, portable steel frame, a PLC (field computer), wireless transducers (sensors), and a cell modem to send data back to your command center. The units are self-powered using a solar panel and battery. Our standard rental agreement includes 4 transducers to measure pressures or levels and additional transducers can be added for an additional cost.



https://www.plowtech.net/plow-technologies-announces-mobile-well-monitoring-skids/.

66.    As shown in the examples below, the Accused System further comprises receiving, with a first computing system, via a network interface, a plurality of commands encoded in a first protocol to control a plurality of different fluid-handling devices at a fluid-handling site, different commands among the plurality of commands being directed to different fluid handling devices among the plurality of fluid-handling devices:

Plow Technologies has rental remote well monitoring skids for operators who want the many benefits of SCADA data and control without the big capital expenditure of permanently installed hardware.

Our SCADA rental skids include a sturdy, portable steel frame, a PLC (field computer), wireless transducers (sensors), and a cell modem to send data back to your command center. The units are self-powered using a solar panel and battery. Our standard rental agreement includes 4 transducers to measure pressures or levels and additional transducers can be added for an additional cost.



https://www.plowtech.net/plow-technologies-announces-mobile-well-monitoring-skids/.    "Our OnPing SCADA and HMI service is the central point of data and control for any Plowtech comprehensive automation system.  You can login from any internet enabled device 24 hours a day to view status, **make changes to operating set-points**, view historical data and so much more."    https://web.archive.org/web/20210516115629/https://www.plowtech.net/product/pump-off-control/.  "OnPing can **control specialized processes and equipment**. Control Plungers, water pumps and even pump jacks and pump off controllers with full down hole cards." https://onping.net/features/.  The further example below shows OnPing being used to provide a method of controlling the tank level of a tank, with the ability to send commands to multiple tanks in the list:

| Tank Name | Tank Level | HIHI Set Point | HI Set Point | Battery Level | Battery Level Set Point |
|---|---|---|---|---|---|
| Well T-710 OT 1 | 5.98 | 18.5 | 18.0 | 3.43 | 2.9 |
| Well T-720 OT 2 | Write Value / View History | 18.5 | 18.0 | 3.42 | 2.9 |
| Well T-610 WT 1 | 10.51 | 18.5 | 18.0 | 3.41 | 2.9 |
| Well T-620 WT 2 | 4.17 | 18.5 | 18.0 | 3.42 | 2.9 |

https://onping.net/wp-content/uploads/2018/10/Control1.mp4 (screen capture at 00:16).

67.    As shown in the example below, the Accused System further comprises a plurality of commands that are responsive to inputs to a command interface presented on a remote user computing device: "Adding a pump component to an HMI is an **efficient way to indicate the state and position of the pump in the control path** or system."  (editing a HMI allows an account user to control a component of an oil or gas facility).    https://onping.zendesk.com/hc/en-us/articles/360005569111-Adding-a-pump-component-to-an-HMI.    "Adding a control group component to an HMI is an efficient way to **create commands like start, stop, enable, and disable**."    https://onping.zendesk.com/hc/en-us/articles/360007874292-Adding-a-control-group-component-to-an-HMI.  "OnPing hosted SCADA / HMI allows you to manage your assets in the field. Setpoints can be set remotely to trigger alarms for any pressure, level or other conditions." https://onping.net/features/.  "Another great example of how Lumberjack Remote is being used is a request we've had from **oil and gas operators over the years**.  Allowing them to go to one place and close multiple wells simultaneously and pause production for an entire field.  This operation had typically meant going site by site and shutting in each one from OnPing manually.  Lumberjack remote with our Virtual and Control Parameter functions allowed us to create a batch control function, giving the operator one master shut in control.  **Shutins can now be handled across**

hardware    and    with    appropriate    safeties    for    an    entire    operation."
https://onping.net/lumberjack-remote/.

68.    As shown in the example below, the Accused System further comprises the plurality of commands being received after determining that a user of the remote user computing device is authorized to issue commands to the first computing system based on a user account that indicates the user is authorized to issue commands to the first computing system, the user account being accessed from a data store:



https://onping.zendesk.com/hc/en-us/articles/360000259511-Creating-a-New-User.  OnPing also provides a single portal for which users representing different entities may log in:



https://onping.plowtech.net/auth/login.

69.　As shown in the example below, the Accused System further comprises for at least some of the plurality of commands, determining, with the first computing system, a plurality of different target states of a given one of the fluid-handling devices over time, wherein the first computing system is operative to maintain control of the fluid handling devices in an absence of an external network connection: On information and belief, the Accused Product includes a fluid-handling device with a variable frequency drive (VFD). https://web.archive.org/web/20210516115547/https://www.plowtech.net/product/variable-frequency-drives/. On information and belief, when given a new target speed, a VFD in the Accused Product will then ramp up to the target point through a set of intermediate RPM (rotations per minute) stages to avoid stress to the mechanical and electrical components. The intermediate RPM stages are a plurality of different target states. Further, "Lumberjack remote with our Virtual and Control Parameter functions allowed us to create a batch control function, giving the operator one master shut in control. Shutins can now be handled across hardware and with appropriate safeties for an entire operation." https://onping.net/lumberjack-remote/. Other examples include scripts executed at the edge that write a plurality of different setpoints.

"Time loops are a handy tool to execute some code for a sequence of time values… This code will do as follows:

- Set the value of the variable to the value of the FROM time. Therefore, the variable will hold a value of type EpochTime.

- Run the code.

- Increase the value of the variable by the value of the EVERY time.

- Run the code.

- Repeat this procedure until the value of the variable reaches the value of the TO time."

    https://onping.zendesk.com/hc/en-us/articles/360003471072-OnPing-Script-Language.

"OnPing uses a scripting language called Structured Script… Our parameters (virtual or control) process data as a stream. . . . The main structure for ensuring a stream has data looks like this:

- example := latestInput(1);

- if (isUnit(example)) then

- output := ();

- else

- output := example/2;

- end_if;"

https://onping.net/control-parameters-and-virtual-parameters-a-series-on-scripting-in-onping/.

"The Lumberjack sits on your site, polling all field devices on a local network, archiving, and storing all the results and passing them to our remote servers.  This means that **even in the temporary absence of a network connection, the Lumberjack proceeds as always, picking up where it left off as soon as a connection is re-established**."  https://onping.net/lumberjack-edge-

computer-specifications/.   "Control Parameters (CPs) are managed locally through Lumberjack

Application System (LAS) and live 'on the edge' in a local Lumberjack.  CPs can access the history

and parameters of the Lumberjack.  Their execution may be set according to several variables,

including by Event, Schedule, or even Frequency.  These edge-located parameters are defined in

OnPing by the parameter they write to.  This means they can create a new data point (if tied to a

manual-entry device in OnPing) or they can be used to script a value directly into an existiing [*sic*]

device."   https://onping.net/control-parameters-and-virtual-parameters-a-series-on-scripting-in-

onping/.

70.   As shown in the examples below, the Accused System further comprises

translating, with the first computing system, the plurality of commands into translated commands

encoded in a plurality of protocols different from the first protocol, at least some of the translated

commands being operative to cause a local controller of the given fluid-handling device to the

plurality of different target states, and the local controller being responsive to the at least some of

the translated commands and feedback from the given fluid-handling device, the feedback being

indicative of whether the given fluid-handling device is in targeted states among the plurality of

different target states: OnPing's website advertises the Lumberjack as supporting a "Wide Range

of   Available   Protocols."    https://onping.net/lumberjack-edge-computer-specifications/.

"Importing Single Parameters for a Modbus Flexible… 4) Once you have selected the parameter

type by either adding a new one or choosing from the list, click "Edit Parameters," then "+ Row"

and fill out the description, starting register, and the read/write capabilities.  Repeat this step for

all   parameters   that   need   to   be   added   to   the   Modbus,   then   click   update."

https://onping.zendesk.com/hc/en-us/articles/360016156152-Importing-Single-Parameters-for-a-

Modbus-Flexible.  *See supra* ¶ **Error! Reference source not found.**.  As shown in the figures

below, for example, Lumberjack devices communicate with "on-site equipment from various manufacturers," which necessarily involves translating the received commands to the protocols necessary to communicate with the various equipment.



# Better Networks with Lumberjack Remote

https://onping.net/?s=better+networks+with+lumberjack.  On information and belief, when given a new target speed, a VFD (e.g., a local controller) in the Accused Product will then ramp up to the target point through a set of intermediate RPM (rotations per minute) stages to avoid stress to the mechanical and electrical components.  The intermediate RPM stages are a plurality of different target states.  Other examples include scripts executed at the edge that write a plurality of different setpoints, and which are responsive to feedback indicative of whether the device is in a targeted state: "Time loops are a handy tool to execute some code for a sequence of time values… This code will do as follows:

- Set the value of the variable to the value of the FROM time. Therefore, the variable will

hold a value of type EpochTime.

- Run the code.

- Increase the value of the variable by the value of the EVERY time.

- Run the code.

- Repeat this procedure until the value of the variable reaches the value of the TO time."

    https://onping.zendesk.com/hc/en-us/articles/360003471072-OnPing-Script-Language.

    "OnPing uses a scripting language called Structured Script… Our parameters (virtual or control) process data as a stream. . . . The main structure for ensuring a stream has data looks like this:

- example := latestInput(1);

- if (isUnit(example)) then

- output := ();

- else

- output := example/2;

- end_if;"

https://onping.net/control-parameters-and-virtual-parameters-a-series-on-scripting-in-onping/.

"OnPing's unique structure of cloud SCADA application and advanced on-site Lumberjack Edge Computers produces industry leading speed with real time polling."   https://onping.net/.   "The OnPing Lumberjack avoids all of this by acting as a micro server on site.  The Lumberjack sits on your site, polling all field devices on a local network, archiving, and storing all the results and passing them to our remote servers."



https://onping.net/lumberjack-edge-computer-specifications/.

# Oil & Gas

OnPing can enable remote management of production sites or entire fields from any device 24 hours a day. Advanced lift applications, HMI, data collection and visualization, alarms and custom reporting, all from one source.

https://onping.net/markets/.

71.     As shown in the example below, the Accused System further comprises sending, with the first computing system, the translated commands to the local controllers: OnPing's website advertises the Lumberjack as supporting a "Wide Range of Available Protocols." https://onping.net/lumberjack-edge-computer-specifications/.  "Importing Single Parameters for a Modbus Flexible… 4) Once you have selected the parameter type by either adding a new one or choosing from the list, click "Edit Parameters," then "+ Row" and fill out the description, starting register, and the read/write capabilities.  Repeat this step for all parameters that need to be added

to the Modbus, then click update." https://onping.zendesk.com/hc/en-us/articles/360016156152-Importing-Single-Parameters-for-a-Modbus-Flexible. *See supra* ¶ **Error! Reference source not found.**. As shown in the figures below, for example, Lumberjack devices communicate with "on-site equipment from various manufacturers," which necessarily involves sending translated commands to the local controllers (e.g., VFDs) of the various equipment.



https://onping.net/?s=better+networks+with+lumberjack.

72. As shown in the example below, the Accused System further comprises obtaining, with the first computing system, site data and storing the site data in a report buffer of the first computing system such that the site data in the report buffer is not lost in the absence of the network connection, the site data including alarms, measurements from sensors, or other data associated with the fluid-handling site or associated with at least some of the plurality of fluid-handling devices: "The Lumberjack sits on your site, polling all field devices on a local network, archiving,

and storing all the results and passing them to our remote servers.  This means that **even in the temporary absence of a network connection, the Lumberjack proceeds as always, picking up where it left off as soon as a connection is re-established**."  https://onping.net/lumberjack-edge-computer-specifications/.  "OnPing hosted SCADA / HMI allows you to manage your assets in the field. Setpoints can be set remotely to trigger alarms for any pressure, level or other conditions."  https://onping.net/features/.

73.    As shown in the example below, the Accused System further comprises sending, with the first computing system, the site data stored in the report buffer to a remote second computing system: "The Lumberjack sits on your site, polling all field devices on a local network, archiving, and storing all the results and passing them to our remote servers.  This means that **even in the temporary absence of a network connection, the Lumberjack proceeds as always, picking up where it left off as soon as a connection is re-established**."  https://onping.net/lumberjack-edge-computer-specifications/.  "OnPing hosted SCADA / HMI allows you to manage your assets in the field. Setpoints can be set remotely to trigger alarms for any pressure, level or other conditions."  https://onping.net/features/.

74.    As a result of Defendants' infringement of the '184 Patent, SitePro has been damaged and is entitled to recover from Defendants the damages sustained by SitePro as a result of Defendants' acts in an amount adequate to compensate SitePro for Defendants' infringement, subject to proof at trial.

75.    Defendants' knowing, willful, and deliberate infringement of the claims of the '184 Patent is in conscious disregard of SitePro's rights, makes this case exceptional within the meaning of 35 U.S.C. § 285, and justifies treble damages pursuant to 35 U.S.C. § 284, as well as attorneys' fees pursuant to 35 U.S.C. § 285.

76.    To the extent Defendants continue to implement other systems that are similar to the Accused System, and/or utilize OnPing or similar platforms, such activities constitute continued willful infringement by Defendants.

## PERMANENT INJUNCTION

77.    SitePro repeats and realleges, as is fully set forth herein, the allegations set forth in the foregoing paragraphs of this Complaint.

78.    SitePro seeks a permanent injunction incorporating the relief sought above on a preliminary basis, and further:

(a)    Barring Defendants from competing with SitePro;

(b)    Providing for all additional restrictions necessary to protect SitePro from the harm likely to result from Defendants continued infringing conduct.

79.    Permanent injunctive relief against Defendants is appropriate because, as SitePro will demonstrate through separate motion and briefing:

(a)    Defendants conduct has caused and will continue to cause irreparable injury to SitePro;

(b)    Monetary damages will be inadequate to remedy the injury;

(c)    An injunction is warranted considering the balance of hardships between the parties; and

(d)    Issuing the injunction would not disserve the public interest.

*Abraham v. Alpha Chi Omega*, 708 F.3d 614, 627 (5th Cir. 2013) (citing *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

## JURY DEMAND

80.    SitePro demands a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, SitePro requests the Court enter judgment in SitePro's favor and against Defendants as follows:

(a)    That Defendants have directly infringed, either literally or under the doctrine of equivalents, the Asserted Patent in violation of 35 U.S.C. § 271(a);

(b)    That Defendants have induced and/or contributed to infringement and/or is inducing and/or contributing to infringement of the Asserted Patent, either literally or under the doctrine of equivalents;

(c)    Awarding SitePro its damages suffered as a result of Defendants' infringement, including, but not limited to, a reasonable royalty pursuant to 35 U.S.C. § 284, SitePro's actual damages, enhanced damages, exemplary damages, costs, prejudgment and post judgment interest to be proven at trial;

(d)    Awarding SitePro costs and expenses pursuant to 35 U.S.C. § 284 or as otherwise permitted by law;

(e)    Ordering a permanent injunction against all present and future infringing acts by Defendants or, in the alternative, an award of an ongoing royalty;

(f)    Finding that Defendants' infringement has been willful at least as of the date of this Complaint, and awarding SitePro appropriate enhances damages pursuant to 35 U.S.C. § 284;

(g)    Finding this case to be exceptional within the meaning of 35 U.S.C. § 285;

(h)    Awarding SitePro its costs, attorneys' fees, expenses, and interest;

(i)    Granting SitePro such other and further relief as the Court deems just and equitable.

Dated:  June 6, 2025

Respectfully submitted,

/s/ *M. Craig Tyler*
M. Craig Tyler
Texas State Bar No. 00794762
CTyler@perkinscoie.com
Andrew Kalamarides (to be admitted *pro hac vice*)
Texas State Bar No. 24136939
AKalamarides@perkinscoie.com
Helena E.D. Burns (to be admitted *pro hac vice*)
Texas State Bar No. 24143961
HBurns@perkinscoie.com
**PERKINS COIE LLP**
405 Colorado Street, Suite 1700
Austin, Texas 78701
Tel: (737) 256-6100

Matthew Lutz (to be admitted *pro hac vice*)
Arizona State Bar No. 038546
MLutz@perkinscoie.com
**PERKINS COIE LLP**
2525 E. Camelback Road, Suite 500
Phoenix, Arizona 85016-4227
Tel: (602)-351-8068

*Attorneys for Plaintiff*
*SitePro, Inc.*